Okay. Thank you, Mr. Evans. When you're ready to proceed. Good morning. Good morning, Your Honor. This is Nicholas Novy. My name is Nicholas Novy. I am an attorney at Deckard LLP, and I was appointed pro bono counsel along with my colleague Joe Hedrick for Appellant Curry Robinson. It's my pleasure to introduce Jacob Abrahamson, who is a recent Penn Law graduate and an admittee under Rule 46.3, who will present the opening argument for Appellant. Great. Before we don't start the clock yet, Greg, before we start, I just want to thank you both for agreeing to take this case pro bono. I want to do it at the beginning because last time I was presiding with pro bono counsel, I forgot to thank the attorney. It was too late after the case ended. So thank you both. It's important. It's an important contribution to the court. Obviously, we could not do our work in cases such as this where a defendant cannot afford representation, absent your agreeing. So, Mr. Abrahamson, thank you and thank your firm and the people at your firm who have agreed very, very graciously to lend the firm's resources to this effort. And Mr. Abrahamson, thank you for agreeing to participate. Mr. Novy, thank you and thank the firm for allowing its resources to be devoted to this representation. Thank you. Okay, Greg, you can start. Our pleasure, Your Honor. Thank you, Your Honor, and good morning, and may it please the court. My name is Jacob Abrahamson for the appellant, Currie Robinson. May I please reserve three minutes for rebuttal? Okay. Thank you. In April 2015, the appellees presented Mr. Robinson with a stark choice, set his religious beliefs aside or be denied treatment. Congress passed for LUPA to subject prisons to the highest form of scrutiny known to American law when they force prisoners like Mr. Robinson to make these choices. And Mr. Robinson was forced to make this choice, and the denial of treatment and subsequent misclassification continue to prejudice him today. Mr. Abrahamson, was not your Mr. Robinson offered admission to this program years ago and showed no interest in it and didn't raise any religious issue at the time? When Mr. Robinson first came to Houtsdale, he underwent the candidacy evaluation, was offered admission, at that time did not seek treatment, and later in his imprisonment did ultimately seek admission into the program for treatment. And when he first sought admission, he didn't raise anything about his religion. He just inquired whether there was another way he could get early release or parole. There was a gap of what, close to 10 years between the first time he was offered admission and when he ultimately raised this religious objection? Yes, Your Honor. I'm not sure the exact length of the gap, but yes, when he initially underwent the evaluation, he did not really raise religious objections. But when he ultimately did seek admission, he did raise those religious objections. I'm not sure of the timeline when Mr. Robinson became a Christian, if it happened while in prison. That is not in the record. I'm not sure. He did enter a guilty plea, right? This is not a trial. He pled guilty? So, he pled guilty to another offense, I believe in the early 90s. This offense was a bench trial. Okay. When he was convicted. Is the claim moot? Because he's out of prison now. He has been released from prison in December of 2019, but his claim is not moot because the consequences of being denied treatment and a misclassification that has labeled Mr. Robinson as a voluntary refuser of treatment, which is not really the full story of what happened at Hounsdale, continues to affect him as he undergoes the mandatory legal proceedings. What is the remedy? You've only asked for injunctive relief here, I believe. Correct me if that's wrong, but what's the remedy? If you win, does that mean we put him back into prison so he can then be admitted to the program? What's the remedy if it's not moot? Your Honor, the remedy here, because Mr. Robinson currently under Pennsylvania law, has a treatment history that both the SOAB, the state police have access to, that the DOC has created, his treatment history currently labels him a voluntary refuser of treatment. And we think the proper remedy here, since obviously he can't go back to prison and undergo treatment, would just be to correct that record. So, when he faces later treatment, he has an accurate really record. Wait, later treatment. Are you premising this on the possibility that he goes back to prison? Because Los Angeles vs. Lyons says we're supposed to presume people will follow the law and not wind up getting arrested again or convicted again. So, I don't see how we can focus on future imprisonment down the road as the harm here. No, Your Honor, I should clarify that he currently under Pennsylvania law is required to undergo treatment outside of prison. And as part of that treatment, he gets an assessment from the SOAB based on his treatment history at Houtsdale. And right now, when they're developing a treatment program for Mr. Robinson, they have a treatment history that does not reflect this entire case, this whole argument that he's making that he had a religious objection. Wait, I don't follow you. Can you follow up on Judge Stephanos' point? How do you correct this problem? How do you fix it? And the problem that he raises. Yes, Your Honor, and I think because there was a refusal to accommodate Mr. Robinson while he was in prison, the primary injury that he didn't receive the treatment can't be corrected. But there's still an existing injury that he has a treatment history. He will undergo treatment outside of prison, evaluations outside of prison. And when these medical professionals with the state are making these diagnoses and giving him an individual treatment plan, and he raises these religious objections again, because it's... How do we know that the plan that he'll be subjected to on release will have the same requirements? Because in your brief, and you're arguing that the state is not showing a compelling interest here, you go at great lengths to argue that there's no uniform standard to these tests statewide. Some institutions require that there be an admission of guilt, some don't to get into the programs while incarcerated. So, how can we be sure? I'll come back to that because there's another aspect to that. How can we be sure that in the future, any treatment plan will require this kind of admission of responsibility? And yes, Your Honor, I want to be careful because I don't want to venture outside the record because if this court needed to hear additional facts related to mootness or remain into the district court to have new discovery. But currently, it's my understanding that Mr. Robinson, when he attends therapy, is told he can't receive treatment unless he does the same exact thing that he was told to do in prison. So then the defendant in that suit should be SOAB or the state police or the ones you mentioned, not the secretary, the warden or the secretary of the Department of Corrections. So, if they're not a party to this suit, they're not going to be bound by a judgment from this suit. You know, why is this case not moot? Why don't we wait and then he brings a suit against whoever might misuse or misinterpret his record saying that they shouldn't be relying on this because of in a future potential suit? I have no idea whether Mr. Robinson wants to bring that suit or will bring a suit against these other entities. But even if he brings a suit like that and wins, he still will always have on his record a treatment history that says he was a voluntary refuser of treatment while in prison. And Pennsylvania law requires the SOAB to consider this information when they're developing a program. Except that we could then issue a judgment in that and that would override Pennsylvania law if there was a loophole problem with relying on that information. You've got the wrong defendant in this case. Under these facts, given his release, it does seem like you've got the wrong defendant. We have no jurisdiction over the folks that you claim would give the relief that would keep this case from being moot. Even if that weren't too speculative. And that's another problem that there's a big chain of things you have to get there, but that's not before us right now. Five minutes. And your honors, I think in both the Sixth Circuit and the Eighth Circuit, there's case law about the fact that when a prison classifies a prisoner and has the power to reclassify that prisoner, which is what is true here, that the DOC has classified Mr. Robinson as a voluntary denier of treatment and retains the power to reclassify that a case is not moot despite release. And I think that same logic should apply here because there's no guarantee that any future suit can solve the problem of that there's an unfair and inaccurate treatment history here. That under Pennsylvania law, these entities are required to consider what happened while Mr. Robinson was in Houtsdale. Rallopa can override Pennsylvania law in a later suit if you accept all of your contentions. And I think one issue as well is that we don't know that Rallopa will, because he was no longer institutionalized as he faces the SOAB and potential other decision makers under Pennsylvania law, whether this Rallopa standard will apply in the same way. And so... I don't understand that. You're saying Rallopa may not apply, that the law that controls now in a subsequent suit, there may be a different law. Is that what you're saying? Well, I believe because Rallopa applies to institutionalized individuals and he's no longer institutionalized, it might be a different standard. Wait, if that's the case, then we can't apply it here either. We can apply Rallopa or not, because he was institutionalized at the time he filed the suit and the gist of this controversy arose. So again, it seems like he could at least plead for declaratory judgment in a future suit that this existing record is tainted because under Rallopa and therefore the state agency shouldn't rely on it. I don't want to keep you on this too long. If my colleagues want to ask more mootness questions, by all means they should, but at some point we ought to talk to you about the merits. I think we're getting to the merits also. Again, this may not be the right case to raise it and we can ask Mr. Mullin about this, but it does seem like there is a real issue that should be addressed by some court at some point, where somebody, either in the religious context or there may be a due process claim, it's not a Fifth Amendment claim, upon conviction, the Fifth Amendment would disappear. But in a situation where someone has a legitimate concern about admitting responsibility, to then withhold rehabilitation in quotation marks based upon that failure to admit guilt, where the person may years later be actually exonerated, that does strike me as being problematic. I don't know what the legal hook is for that and maybe you can help me with that. Sure. And I think that the nature of the problem is that their compelling interest was to rehabilitate Mr. Robinson and Mr. Robinson doesn't challenge that contention, but the policy that they led to Mr. Robinson receiving absolutely no rehabilitation. Okay. Now, Mr. Abrams, let's conceptualize this as a compelling interest in rehabilitating sex offenders, not just Mr. Robinson, but sex offenders, pedophiles, however we want to frame the class. Their argument is that that's a compelling interest and you're not disputing that's a compelling interest. You're disputing whether this is narrowly tailored to serve that compelling interest, right? Yes, Your Honor. Okay. As I understand the state's argument, it's that we give people discounts, not as a rule, not as a, like a, because we like them or as a benefit, but because their risk of recidivating has been lower. And from what we know of 12-step programs and the like, the standard way, the way we have good data is that one of those 12 steps is admitting guilt as a, as part of a group dynamic of working through one's wrong and turning over a new leaf and confronting one's wrongful acts. And that's, that's what has proven the people who can survive the 12 steps have much lower rates of recidivism. So they, they've been rehabilitated. They need less punishment. And what your client wants is he wants the sentencing discount without having gone through the steps, which involve this group dynamic of working through guilt and confronting wrong. He wants to say, I can do this privately, but that's not the way that these programs work. And the state can't have any confidence that he's worked through it all. So how does he get the benefit of a sentence discount without the work of working through to his rehabilitation and reform in this group setting? Your Honor, I think one thing that's about access to the program at all, obviously parole would not be a guarantee. Even if he went through the program, did the whole thing, that would be a separate question that the parole board would have to decide. And so really Mr. Robinson, it's one small, it's one aspect of the program, the confessional aspect that he has a religious objection to. And in his deposition of Mr. Arrigo, the prison, one of the prison officials that was in charge of managing this program, Mr. Arrigo even made clear that just because someone checks the box on the form that says that they accept responsibility, which is what Mr. Robinson was unable to do because of his religious beliefs, doesn't mean that they are necessarily rehabilitated and that someone can introspectively rehabilitate. But the reverse of that is not necessarily true. That's the problem. I mean, anybody can check the box and that doesn't mean anything. I understand that. But is the reverse of that true? That if they don't check the box, given what Judge Biba said about the underlying premise of some of these programs, that interferes with the therapeutic recovery or rehabilitation or reentry, however you want to phrase that, because they're not engaging in part of the process that at least the state through the institution deems as being a condition preceding to turning themselves around and that is confronting the guilt and responsibility. Your Honor, you're correct that by not checking that box, it might become more difficult to know in particular whether they accept responsibility because that is what Mr. Robinson can't do because of his religious beliefs. Mr. Robinson likens his admission to a confession, which I think is, I think there's a significant difference. I mean, he is not being asked to confess as if he were in a church or confessing to a priest. He's asking to admit or state the nature of the problem so that he can get treatment. It's like seeing any doctor. You state the nature of the problem, the injury, and then you get treatment. What's wrong with that? Your Honor, I believe that Mr. Robinson's religious objection boils down to the fact that engaging in the sex offender treatment program involves a form of receiving either mercy or forgiveness in any context. No, no. It's a correction of behavior. It's therapeutic. I disagree with your characterization. It's to avoid a repetition of the same conduct, isn't it? Yes, Your Honor. I think you're right, but also from Mr. Robinson's point of view, from his religious point of view, that is what's going on. Let's assume, let's assume. His religious point of view can't define the program though. What isn't this, what evidence do you have that a program that doesn't follow this standard course of publicly admitting guilt, whether that conflicts with his beliefs or not, that those programs work as well such that he's rehabilitated enough that the state should still give him a discount because he's less dangerous? Because it does seem like the question is, is there another program that would work well enough that he ought to be able to get the same credit? And the record here, you tell me about the record, the record, the only evidence in the record seems to be the standard way this works. Yeah. So what evidence is there that the state ought to be treating what he wants to do, a private admission to himself as functionally about as effective as the standard, the gold standard here? Your Honor, I think that under LUPA and as Holtley-Hobbs clarified, that it was the prison officials' burden to show evidence that there was no possible way that a program without that confessional requirement could work. So Mr. Robinson- No possible way? If they say that this likelihood of him succeeding in terms of rehabilitating himself or addressing his problem is substantially improved, not 100% but substantially improved if he goes through the program as they have laid it out, isn't that enough to meet the compelling state interest test? Substantially increasing the likelihood of successful release from prison and not recidivating? Your Honor, I think that they have shown, they have not shown that a program without the confessional aspect could not be the same substantial improvement. What they argue is that simply it's either this program or nothing at all. And that is not enough to satisfy- How can they prove a negative? Isn't it enough for them to put in evidence, this is the standard way it's done, this is the way we do it, this is where we have data. I mean, maybe you don't think there's enough evidence in the record of that. But if they have shown this is the way it's done, this is the way we've always done it, this is a successful way, isn't that enough to discharge their burden such that you have to then come back with some evidence that his private confession is equivalent or roughly equivalent or something like that? You haven't put any evidence like that in, have you? Well, Mr. Rigo in his deposition acknowledged that an individual introspectively could achieve the same goal, the same acceptance of responsibility as the state seeks as a key part of rehabilitation. Wait, can you take me to where in the record he says that that is equivalent for treatment purposes? And I need to be careful with the word equivalent. I don't know that that is the exact word that Mr. Rigo uses. On joint appendix page 115 is that deposition. Okay. We're in the deposition. One second, John, I'm sorry. If you want to, we almost have time, maybe. We can get you a bottle if you need it. A 28-J letter afterward, either way. Okay. Thank you. I have one additional question. Go ahead. Yeah, I see a very significant difference between the admission of wrongdoing and a confession as in the religious context. And in the prison context in regard to this program, what he is being asked to do is to admit his wrongdoing, not to confess as in religion. Could you tell me why I'm wrong about that? Your Honor, and I think that one part of Mr. Robinson's religious beliefs is that anything, because this program necessarily is about rehabilitation and ultimately potentially mercy in the form of parole, that Mr. Robinson feels that it is the same as a confession in a church or whatever setting he feels is appropriate to confess. But that's the big difference when you confess in a church context, because you're confessing to a priest. That's not what's taking place here. He's merely being asked to admit to his wrongdoing so that he can get treatment for it. And I think that while to some, and to some Mr. Robinson doesn't make that distinction in his own religious beliefs. Mr. Abramson, I found the portion in the record you're talking about, and there's some discussion at JA 112, 113, the prison can't be sure that he's actually done it if he doesn't voice it. Then there's some discussion about how having to accept responsibility serves as some deterrence. But then at JA 115, the question for Mr. Robinson's lawyer, is it possible that a person can acknowledge and understand how wrong behavior was without telling someone else? Of course. Is it commonly held that successful treatment can't take place without admitting guilt? And the prison official says, acknowledging that the crime was committed allows us to look at other aspects of sexual offending to help the individual avoid offending in the future. So there's a treatment reason why admitting publicly allows the treatment to proceed. Then there's a question, what's the difference between being made accountable by the prison term and taking responsibility? And there's some discussion about helping to understand is verbal communication required? Oh, someone can put it in writing, but talk therapy is the best way because I know that voice inflection, body language, the emotion behind it, I don't know what they're really up to. So I don't see anything around JA 115 that says it is as effective for treatment purposes. It's just that, yes, someone can privately understand his wrongfulness, not that this is equivalent for treatment purposes, but confronting to it, listening to it, making it a stepping stone for later parts of treatment. I don't see any record evidence you have that this is equivalent for treatment purposes, just that this is one piece of it can start with confronting it internally, not that that's the case. And I think one question is that there were six other phases of treatment, six other parts of treatment that could have led, and they do involve this group therapy that Mr. Rigo discusses in that deposition, that because the bar was placed at the very beginning, the thing that Mr. Robinson took issue with and had a religious objection to was placed at the very beginning, he couldn't access any of the rehabilitation that Housetail offered. Okay, you might have had a claim that he should have been given the books or been able to do some part of it, but that part is moot now because he can't go back and get that. All he wants is the reward from successfully completing and graduating, but you're telling us his conscience is such that he can't do one of the things that is required to graduate. So I don't see how he is or would be better off because he can't, maybe they should have given him the books or let him take part in the first parts, but he can't or couldn't have graduated. Sure, and I think that this case really, especially now after his release, is not about the ultimate reward because he obviously can't receive the parole benefits or any of the other benefits of treatment, but it is about the fact that his record says he refused treatment when in reality there was more to what happened. The appellees refused to let him into the other phases of the program, receive the educational material. I thought your theory here was that maybe his date for termination would be moved up of sex offender supervision, but your theory now at argument is, it's really just about what the record says about refusal versus failure to complete the program. It's about the wording. And your honor, I think that the potential of the date moving up is... Is that right? Yeah, answer the question first. Is that correct? Yes, your honor. I think that is our... That is the best tie to a collateral consequence of what happened in prison to what the harm is now that Mr. Robinson faces. So what is the result that you're seeking, Mr. Abramson? The result is for his treatment history to accurately reflect that Mr. Robinson didn't enter into treatment at all because of a religious objection, not because he simply refused treatment. Now, what's the disposition you're seeking? Oh, I'm sorry. It's a remand, a reverse and remand of the grant of summary judgment. He did refuse seven years ago. You're just asking for it to reflect that on the latest occasion he was willing to do it. Yes, your honor. Any other questions at all? You did reserve some time for rebuttal, I think, didn't you? Yeah. Because we're way over on your main time. Thank you very much. Mr. Mullen. Thank you, your honor. May it please the court. Daniel Mullen on behalf of the Department of Corrections Appellees. This court has held that claims for injunctive relief under RLUIPA or the First Amendment are moot upon an inmate's release from incarceration or even transfer to a different facility. That is because an injunction where the plaintiff is no longer imprisoned cannot provide him with meaningful relief. And that is the case here. Robinson nonetheless urges this court to engage in a purely academic exercise and provide him with an advisory opinion on the DOC sex offender therapy program. But there's no reasonable expectation that he will again be subject to that very program. And with due respect to this panel, it's not the court's role under Article 3 of the Constitution to weigh in on moot claims because it could hypothetically be useful to rather this court's authority is limited to deciding active cases and controversies. And that's a that's a requirement that must exist through each stage of litigation. Mr. Mullen, let's go ahead. But don't if nominal damages are or were in the case, then that would not be moot under our Freedom from Religion Foundation case, right? Yes, if he had actually shot damages, then those claims would not be moot. But that's not what he sought here. He only sought injunctive relief. His complaint said injunctive relief and any other relief as the court deems proper. And he was pro se. We could read that broadly for a pro se plaintiff and say nominal damages are in the case. I think the you know, in his complaint, he said many times injunctive relief. All I want here is injunctive relief. I think if he had wanted damages of some sort, he would have made that clear in his complaint and had an obligation to do so. Let's assume for a moment that the case is not moot. And I think you heard my question, Mr. Abramson. There is a concern, I hope that even you might share it, that if we have someone who is incarcerated who maintains their innocence, and they're denied admission to a program that could increase their early release or get the earlier release, because they won't accept their guilt, but they know that if they accept guilt, they're basically destroying any hope they have for any kind of exoneration, be it the governor or by a district attorney's investigation or any other route. Does that create a problem in your mind, that tension? Well, Your Honor, I believe this court addressed that in Ranchenski. And I think that is a totally different case than what we have here. That's why it's hypothetical. If it was this case, it wouldn't be hypothetical. That's why it's hypothetical. So I understand, Your Honor. But yes, I believe this court already addressed that. And I don't think there's any issue because, you know, parole is not a right, it is a privilege. And I think it is perfectly acceptable for us to condition parole upon him dropping his appeal of his criminal conviction. Okay. But I think the way I asked it was whether or not you're at all troubled by the hypothetical that I posed. So, Mr. Mullen, please answer that question. I do want to hear it. Yeah, I'm not troubled by that, Your Honor, because I think... Well, that saddens me, Mr. Mullen. That does sadden me. Maybe that goes away to explain some of the situation where you're saying you're not troubled by a situation with someone who maintains their innocence, who may theoretically... Let's say that the record is being built by whatever authority to actually go forward and prove the person is not the right person. DNA evidence that was not tested at the time, but has since been tested, but has not yet been submitted to the court. You're saying it doesn't trouble you that in the interim, the person is required to admit their guilt, thereby compromising their possibility of exoneration in order to be admitted to some program that might accelerate their release. I'm not asking a legal question. That doesn't trouble me. I don't think we're asking them to admit their guilt. I think we're asking them to acknowledge conduct that has already been adjudicated in a court of law. And for therapeutic purposes, and for the purpose of altering behavior so they don't repeat that behavior again in the future, I think it's quite different than an acknowledgment of guilt as far as a criminal case is concerned. Okay. So I'll take that as a no. That was a no, is the answer to my question. That's a no, Your Honor. Mr. Mullen. Yes. So is Mr. Abramson right that Mr. Robinson wanted books, wanted whatever materials he could share, and was denied even that? I don't understand why you wouldn't give this man something to help him get whatever benefits he could, even if he's not allowed to be part of or graduate from the program. Why didn't you accommodate him to that extent? Or why wouldn't you accommodate an inmate to that extent? Well, I think what he was asking for was sort of constantly shifting, Your Honor. And I think what he was primarily asking was, can you deem me compliant with the program if I do a few homework assignments here or there? And I don't think that is enough to be deemed compliant with the program. Your Honor, when I was in my first year of law school, if I had approached my dean and said, you know, I don't really want to be here for three years sitting through classes and taking all these pesky exams, but if I do a few homework assignments, can you give me a law degree anyways? I don't think that request would be well received. But that's basically what Mr. Robinson asked here. He said, can I do a few homework assignments, forgo the most critical aspect of the program, which is acknowledging responsibility and not denying the past conduct? Can I forego that and nonetheless be deemed compliant? And so, given that that was what he was asking, I don't think we had any obligation to heed that request. Was he, Mr. Mullen, was the institution skeptical that he held that his beliefs were firmly rooted in his religious belief? I don't believe there's evidence as part of this record that the prison officials were, skeptical as he was asserting these various inquiries. But I think given the history with this inmate that he had spent years, I believe it was around nine or 10 years, trying to get around this program and to be excused from the program. And then he suddenly comes up with this religious justification. But even then, he's not being very clear about how the program violates his religion. You haven't pursued that issue, though. The sincerity issue, I don't think you really litigated it. They're not contesting it. Well, I think it's true that it wasn't addressed below, Your Honor. Our primary argument below was that before you even get to sincerity, there's a sort of threshold issue that he was never even denied access to the program and never even sought access to the program. And then we made an alternative argument that we satisfy strict scrutiny. And now on appeal, I think this court has the ability to assess the record and affirm for any valid reason that's supported by the record. And I think the record... Yeah. When Mr. Abramson comes on rebuttal, I'd like to see if he has any record citation of the contrary about whether he in fact sought access to the program or not, because it does seem like he's been jumping around. It's hard to pin down what he's really been asking for here. I agree, Your Honor. I think he was, again, his requests were constantly shifting, but the one constant throughout was his focus on getting parole. What he wanted was to get out of prison as quickly as he possibly could. And he was coming up with whatever justification and whatever alternatives that occurred to him on a given day in order to achieve that goal. Mr. Abramson argues in his brief that statewide from institution to institution, the program is very to the extent that they don't always require this kind of admission of guilt. Do you know whether or not that is true? That's not true, Your Honor. The program is uniform with respect to the acceptance of responsibility. What I believe the appellant is referring to is that one thing that is unique to this prison in particular is that there is a separate housing unit for all of the offenders where they live as a group and do group therapies and things like that. But otherwise, Hootsdale, like every other institution within the DOC, follows the DOC policy, and that policy puts forth that acceptance of responsibility is a fundamental aspect of treatment. Is this program confined to sex offenders, or are these types of programs available for other types of offenders? I believe this particular program, Your Honor, is limited to sex offenders. I don't think it's part of the record, but I think there are other therapeutic programs that are generally available. But this specific one is limited to sex offenders and is tailored to some of the unique issues surrounding sex offenses. Do you have data on success rates? And relatedly, can you tell if the effect here is that the treatment is changing people, and or is it that a number of people are failing out, and the people who fail to accept responsibility, et cetera, show themselves to be worse risks? Five minutes. You know, I don't have hard data at hand, Your Honor. I think the effectiveness in the program is shown through the fact that people who complete it, people who stop denying their past and come to terms with it, are less likely to then go out in the world and commit additional sex offenses. But what's in the record? What's in the record that shows that this is narrowly tailored for that admittedly compelling governmental interest? Well, I think the narrow tailoring, Your Honor, is in the fact that the acceptance of this inherently flexible aspect of the program, it's not something that we just ask once and that's it. And in fact, deniers are allowed to enter the program initially. And Mr. Robinson here was recommended for the program, notwithstanding the fact that he started off as a denier. So it's a sort of ongoing process that's evaluated through each phase of therapy. So you're saying there's a phase where you're not required to admit your guilt initially, you can come into the program, go through initial stages. But at some point in order to advance to the next phase, you have to then admit guilt. And that's where Robinson fell down. Is that the situation? Well, basically, correct, Your Honor, I wouldn't call it admitting guilt. We want them to acknowledge their past conduct. And again, it's something that's evaluated on an ongoing basis. So for example- We're splitting it, Harry, between admitting guilt versus acknowledging past conduct. Let's assume that when one acknowledges past conduct, which is in fact criminal, that that's the same as admitting guilt. So we can get past that semantic dance. Yes, Your Honor. Well, it's a part of the program that's ongoing. So for example, if somebody comes into the program who is initially willing to, you know, acknowledge their past conduct, but then later is found to be minimizing that conduct, that can prevent them from completing the program. So the acceptance of responsibility is evaluated throughout. And I believe it's around 18 months, typically, to complete this therapy. So it's a part of the program that is constantly being evaluated. I may have missed what you said, but did he take advantage of that early part of the program where he could receive some treatment without making any kind of admission of wrongdoing? Did he take advantage of that? No, Your Honor. No, Your Honor. In other words, he was resistant from the beginning? That's exactly right, Your Honor. In 2007, when he first entered the DOC, he was evaluated for the program. And even though he was a denier at that point, he was specifically recommended to enter. But he believed treatment was unnecessary. And so he declined to participate at that point. So his early explanation was not based on religious grounds. It was his belief that treatment simply wasn't necessary for him? That's exactly right, Your Honor. And in fact, as part of the initial intake evaluation, he was specifically asked, can you discuss your offenses openly in group? The answer he gave was yes. And then there was another question on that same form. Do you believe you need treatment? The answer was no. And so the reason he didn't enter the program at that stage in 2007 was he didn't think it was necessary. And then seven and a half years go by. And it just so happens that when he reaches the point where he would have otherwise been eligible for parole, he starts sending all these inquiries to the DOC staff asking about the program, seeing if he can be deemed compliant, seeing if he can do a few homework assignments here or there. And again, I think it was quite clear at that point that his priority was parole and not maintaining his religious views. But you're not contesting, at least I don't think you contested, his sincerity. That's not really before us. And nor could it be. We can't make a finding of fact on that. So, Mr. Mullen. Yes. As I understand it, you allow 20% of people in who are not yet accepting responsibility. Something like that is in the record, right? I think that's correct, Your Honor. Now, let's talk about why allow some but cap it. Is there anything in the record about how the presence of more than 20% or presence of large numbers of people who don't accept responsibility would change the program? Is there a way in which his being in the program while refusing to open that door would change the program for other prisoners or inmates? Your Honor, that's a really good question. And to be frank, it's not something I thought about before now. And I don't think it's part of the record. But I think perhaps it could have something to do with the, you know, if you have too many people in the program who are all of whom are denying that they committed these acts and they're all living together and doing therapy together, I think part of what gets people who are initially deniers to later come to terms with what they did and accept responsibility is being in a group therapy setting where other people are doing that and sharing their experiences. And I think perhaps the concern is if you have too many inmates who are not doing that and are not willing to do that, then there perhaps wouldn't be progress in that regard. Do you think McKeown v. Lyle, a Fifth Amendment case, has any relevance here? Sorry, could you repeat that, Your Honor? McKeown v. Lyle is factually the most similar case, but it was decided under the self-incrimination clause. Do you think that case has any relevance to our consideration? Well, I agree with you that it's not an all fours with this case, but I think it's in that case acknowledged that denial of one's crimes is a principal impediment to successful therapy when it comes to sex offenders. So I agree with you it's not binding because it arose under the Fifth Amendment and dealt with different facts, but I think it's certainly relevant to the strict scrutiny analysis because the court recognized, and this court in Newman recognized it as well, that denial is a principal impediment of therapy. Anything else? I have nothing. I have nothing else. Okay, I believe you have. Greg, is it time? It is up, I believe. Okay, well, thank you, Mr. Mullin. Thank you. We'll go back to Mr. Edmondson. Mr. Edmondson, we'd like to go over a bit on your initial presentation, but we're going to be a little bit more focused on your time this time around. Yes, Your Honor. Thank you, and may it please the court. I first want to discuss the parole element of this and how really Mr. Robinson's case, especially now, is not about parole. It's about rehabilitation. It's about access to the rehabilitation program. If his priority was parole, a RLUIPA lawsuit was not the fastest way for him to get out of prison or receive parole. He could have, if he didn't have these religious objections, simply checked the box and gone through the program as normal. Mr. Edmondson, it's not precisely about he wants to be rehabilitated. It's that he wants a notation change that would get him better treatment going forward. That's your theory of non-mootness, right? Yes, Your Honor. Well, I think a notation that would accurately reflect what happened in his treatment history. Do you have any further answer to the issue about why these are the right defendants to get any benefit from the board or the police or anyone else? Sure, Your Honor, and I think it's because we're not challenging the assessment that SOAB will undergo. We're not challenging the time that he was released from prison due to parole. We're challenging the fact that the DOC has labeled him as a voluntary refuser because they denied him treatment, and that label will stay with him as long as the DOC is allowed to classify him in that way. So it's really their injury. That's why they're the proper defendant. It's rooted in something that the appellees did and can correct. But in cases like Spencer v. Kemna, we treat criminal challenges as moot, even though people want the label wiped off them, that the labeling is not enough if you can't point to some collateral consequence of a conviction. And we will presume consequences in a lot of settings, but not when someone is completely released from any custodial supervision. Sure, Your Honor. I think that's one. Because this mootness issue arose on appeal, there is an inherent weakness in the record in that what we know is that the SOAB is required to consider his treatment history. We don't have any discovery on exactly how they weigh it, exactly whether that will result in either more harsh treatment or anything. So we would need more discovery on that specific question. Could you respond to Mr. Mullen's characterization of the record that your client never sought access to the program to say the steps that he could complete? At least he didn't seek access the second time around. Certainly, you're not disputing he rejected the initial invitation to take part. But later on, was he trying to get in and do the parts of it he could do without admission of guilt? Do you have any record citation to contradict Mr. Mullen? Yes, Your Honor. Let me look for a specific citation. But Mr. Robinson, while I agree that his specific requests changed at various times in the record, he, in his meeting in April 2015 with Vincent DeFelice, and his account of that, I believe, is on a joint appendix, at least 122, and I believe it's a few pages before and after, that he was told that he had to set his religion aside if he wanted to enter the program. Because while it is DOC policy to admit 20% as deniers, as Mr. Mullen said, from Mr. Robinson's perspective at that point, he was told that he could not even enter the program without checking that box. JA-122 doesn't talk about entry into the program. He said, he told me I would have to set my religion aside, but that could be to complete the program. I don't see anything that said it was a barrier to even entering the program. Your Honor, I don't have the specific page number right in front of me here, but I'm happy to provide that. If you could send us a 28-J letter. I believe your time is up. Are there other questions at all, Judge Fuentes or Judge Davis? No, I'm fine. Thank you very much, Mr. Hibbs. And again, thank you for undertaking the representation and for the job you did. You were working on this while you were working on your finals? Yes, Your Honor. Okay. You can multitask. Okay, well, thanks again. Thank you. We'll take the matter under advisement.